

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-30-1999

# Frog, Switch & Mfgr'g Co. v. Travellers Ins. Co.

Precedential or Non-Precedential:

Docket 98-7552

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Frog, Switch & Mfgr'g Co. v. Travellers Ins. Co." (1999). *1999 Decisions.* Paper 269.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/269

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 30, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-7552 and 98-7553

THE FROG, SWITCH & MANUFACTURING CO., INC.,
Appellant in No. 98-7552

v.

THE TRAVELERS INSURANCE COMPANY
(D.C. Civ. No. 98-cv-00643)

THE FROG, SWITCH & MANUFACTURING CO., INC.,
Appellant in No. 98-7553

v.

UNITED STATES FIRE INSURANCE COMPANY
(D.C. Civ. No. 98-cv-00758)

On Appeal From the United States District Court
For the Middle District of Pennsylvania
District Judge: Honorable William W. Caldwell

Argued: July 13, 1999

Before: BECKER, Chief Judge, ROTH and RENDELL,
Circuit Judges.

(Filed: September 30, 1999)

R. JAMES REYNOLDS, JR.,
 ESQUIRE (ARGUED)
Thomas, Thomas, Armstrong
 & Niesen
212 Locust Street
P.O. Box 9500
Harrisburg, PA 17108

Counsel for Appellant The Frog,
Switch & Manufacturing Co.

WILLIAM T. CORBETT, JR.,
 ESQUIRE (ARGUED)
Shanley & Fisher
131 Madison Avenue
Morristown, NJ 07962-1979

Counsel for Appellee
Travelers Insurance Co.

FRANCIS J. DEASEY, ESQUIRE
 (ARGUED)
Deasey, Mahoney & Bender
1800 JFK Boulevard, Suite 1300
Philadelphia, PA 19103-2978

Counsel for Appellee United States
Fire Insurance Company

OPINION OF THE COURT

BECKER, Chief Judge.

This case requires us to interpret two insurance policies to determine whether the insurers had a duty to defend the insured against a lawsuit brought by a competitor for theft of trade secrets, unfair competition, and reverse passing off. The policies covered claims against the insured for "advertising injury." The definition of "advertising injury" in standard business insurance policies has troubled and in some cases confounded courts for years. This case involves allegations that the insured stole various ideas and then advertised the results of that theft; the question is whether the advertising converts the theft into "advertising injury."

2

We conclude that it does not, and that, by the plain terms of the policies, the insurers had no duty to defend against such claims. We also rule that the insured cannot maintain actions for bad-faith denial of coverage against them. We therefore affirm the District Court's order granting summary judgment to the principal insurer, Travelers Indemnity Co. (named as "Travelers Insurance Co." in the caption) ("Travelers"), and its Fed. R. Civ. P. 12(b)(6) order dismissing the insured's complaint against the excess carrier, United States Fire Insurance Co. ("USFIC").

I. Facts and Procedural History

Plaintiff is The Frog, Switch & Manufacturing Co. ("Frog"), a manufacturer of industrial products. Defendants are Travelers and USFIC, which issued insurance policies to Frog that are identically worded in relevant part. Travelers issued a basic policy with an advertising injury limit of $1,000,000, and USFIC issued an excess policy that covered claims that exceeded the retained limit. Under the policies, the insurance companies agreed to pay sums that Frog became legally obligated to pay as damages for "advertising injury" "caused by an offense committed in the course of advertising your goods, products, and services." "Advertising injury" was defined as, inter alia, "injury that arises out of your advertising activity as a result of: . . . (3) misappropriation of advertising ideas or style of doing business." The policies further provided that the insurance companies had the right and duty to defend against any suit seeking damages covered by their policies.

On July 17, 1995, a Frog competitor, ESCO, filed suit against Frog and one of Frog's employees, John Olds. ESCO alleged that, in January 1995, it had acquired a dipper bucket product line from Amsco Cast Products, Inc. ("Amsco"), including Amsco's trade name, trademarks, and copyrights. The complaint (hereinafter "the underlying complaint") maintained that, prior to ESCO's acquisition of Amsco, Olds—who had been Amsco's chief engineer for the dipper bucket product line—misappropriated from Amsco trade secrets and confidential business information, including drawings and prints related to the dipper bucket

3

product line and delivered that information to his new employer, Frog.

ESCO also alleged that Frog then entered the dipper bucket product market, using Amsco's proprietary trade secrets, confidential business information, and technology misappropriated by Olds. The complaint asserted that Frog had engaged in unfair competition based on the misappropriated information. ESCO's Revised Second Amended Complaint also added two causes of action for false advertising and reverse passing off under the Lanham Act, 15 U.S.C. S 1125(a), which prohibits false or misleading descriptions of fact in commercial advertising and promotion.

The relevant paragraphs of Count Nine, "False Advertising Under Lanham Act," are as follows:

> 76. Shortly after Olds became employed by Frog commencing October 17, 1994, defendant Frog launched a promotional campaign to the market for all cast manganese dipper buckets. This campaign included widespread distribution of a product promotional brochure, publication in an industry trade journal, and verbal and written direct communication to customers. In this campaign, defendant Frog falsely represented that it had developed a new and "revolutionary" design for dipper bucket parts and components, and falsely depicted a dipper bucket with a "Frog, Switch" logo.

> 77. In fact, at the time of defendant Frog's campaign, it had done no design work whatsoever, and the parts and components Frog was offering for sale and was selling were made from engineering drawings unlawfully appropriated by Olds from Amsco and used by Frog. The market was falsely led to believe that products of the type contained in the Amsco line could readily be replicated, produced and sold by Frog.

> 78. Plaintiffs have been damaged by defendant Frog's actions in an amount to be proved at trial.

Count Ten, "Reverse Passing Off Under Lanham Act," alleged in relevant part:

4

81. The parts and components sold in commerce by defendant Frog as its own were really Amsco products made by use of the stolen drawings, a form of "reverse passing off."

82. Plaintiffs have been damaged by defendant Frog's actions in an amount to be proved at trial.

Frog timely gave Travelers and USFIC notice of the ESCO litigation and copies of the complaint and the amended complaint, and requested that the insurance companies defend the suit, on the grounds that the ESCO complaint alleged acts that were potentially covered by the insurance policies. Both Travelers and USFIC refused. On June 5, 1997, prior to trial, Frog and ESCO settled for $2,625,000.

Frog sued the insurance companies for breach of contract and for bad faith in failing to honor the insurance policy under 42 Pa. Stat. Ann. S 8371. The District Court granted summary judgment to Travelers and granted USFIC's 12(b)(6) motion to dismiss.1

II. The Duty to Defend

A. General Principles

The parties agree that the insurance contracts are governed by Pennsylvania law. The policy was issued by a Pennsylvania agent to a Pennsylvania corporation. See Travelers Indem. Co. v. Fantozzi ex rel. Fantozzi, 825 F. Supp. 80, 84 (E.D. Pa. 1993) (Pennsylvania conflict of laws principles dictate that an insurance contract is guided by the law of the state in which it is delivered).

General rules of insurance contract construction require us to read the policy as a whole and construe it according to its plain meaning. See Atlantic Mut. Ins. Co. v. Brotech Corp., 857 F. Supp. 423, 427 (E.D. Pa. 1994), aff'd, 60 F.3d 813 (3d Cir. 1995). Ambiguities must be construed in

_____

1. We treat the insurers together despite the differing procedural background. A 12(b)(6) motion may be granted where the insurance contract unambiguously reveals that an insured is not entitled to coverage. See Bartley v. National Union Fire Ins. Co., 824 F. Supp. 624 (N.D. Tex. 1992).

favor of the insured because the insurer writes the contract, but a provision is ambiguous only if reasonable people could, in the context of the entire policy, fairly ascribe differing meanings to it. See id.

We need only examine the insurer's duty to defend to resolve this appeal. An insurer's duty to defend an insured in litigation is broader than the duty to indemnify, in that the former duty arises whenever an underlying complaint may "potentially" come within the insurance coverage. See Erie Ins. Exch. v. Claypoole, 673 A.2d 348, 355 (Pa. Super. Ct. 1996). Furthermore, if a single claim in a multiclaim lawsuit is potentially covered, the insurer must defend all claims until there is no possibility that the underlying plaintiff could recover on a covered claim. See Erie Ins. Exch. v. Transamerica Ins. Co., 533 A.2d 1363, 1368 (Pa. 1987). It follows that there may be a duty to defend without a duty to indemnify. See Aetna Life & Cas. Co. v. Barthelmy, 836 F. Supp. 231 (M.D. Pa. 1993), rev'd on other grounds, 33 F.3d 189 (3d Cir. 1994). In determining the existence of a duty to defend, the factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured. See Biborosch v. Transamerica Ins. Co., 603 A.2d 1050, 1052 (Pa. Super. Ct. 1992).

Relying on Safeguard Scientifics, Inc. v. Liberty Mut. Ins. Co., 766 F. Supp. 324, 330 (E.D. 1991), Frog argues that the duty to defend also arises if the underlying complaint could reasonably be amended to state a claim under the policy. Safeguard Scientific's formulation of the duty to defend applies in a particular situation--when the underlying complaint alleges intentional action, but negligent or reckless action would suffice to make the insured's conduct actionable--and is merely a way of saying that such a complaint "potentially" comes within the insurance coverage.[2] At all events, Frog argues that the

_____

2. More specifically, Safeguard Scientifics holds that the insured should not be dependent on the underlying plaintiff 's pleading on state of mind, which may be inapt. When a complaint alleges intentional misconduct (which insurance policies exclude from coverage) but might be amended to allege some other state of mind that would both trigger coverage and show liability, then the complaint should be treated as setting forth facts
that potentially justify coverage. See Safeguard Scientifics, 766 F. Supp. at 329-30. This rule reflects the way that the complaint will actually be treated in the courts during the underlying litigation.

ESCO complaint, either initially or in amended form, did in fact allege injury covered by the policy.

B. Covered Advertising Injuries

The policies at issue here define advertising injury to cover four specific categories: (1) slander, libel, or disparagement of goods, products, or services; (2) violation of a right of privacy; (3) misappropriation of advertising ideas or style of doing business; and (4) infringement of copyright, title, or slogan. This is standard language for defining advertising injury in commercial general liability policies. See Lee R. Russ & Thomas F. Segalla, 9 Couch on Insurance 3d S 129:25 (1997). The applicability of these categories to a variety of torts has been the subject of numerous cases in federal courts. With varying degrees of success, insured parties have sought coverage for the underlyingactions of patent infringement,[3] trademark or trade dress infringement,[4] misappropriation of trade secrets or other confidential information,[5] and actions alleging harm to consumers rather than competitors.[6] Here, Frog seeks coverage based on allegations that it engaged in unfair competition by using misappropriated information and false advertising and reverse passing off under the Lanham Act.

We commence our discussion with some analysis of
_____

3. See, e.g., Elan Pharmaceutical Research Corp., 144 F.3d 1372 (11th Cir. 1998); Iolab Corp. v. Seaboard Surety Co. , 15 F.3d 1500 (9th Cir. 1994); Atlantic Mutual Ins. Co. v. Brotech Corp. , 857 F. Supp. 423 (E.D. Pa. 1994), aff 'd, 60 F.3d 813 (3d Cir. 1995); Gencor Indus., Inc. v. Wausau Underwriters Ins. Co., 857 F. Supp. 1560 (M.D. Fla. 1994); National Union Fire Ins. Co. v. Siliconix, Inc., 729 F. Supp. 77 (N.D. Cal. 1989).

4. See, e.g., Advance Watch Co. Ltd v. Kemper Nat'l Ins. Co., 99 F.3d 795 (6th Cir. 1996); Union Ins. Co. v. The Knife Co., 897 F. Supp. 1213 (W.D. Ark. 1995); Poof Toy Prod., Inc. v. United States Fidelity & Guar. Co., 891 F. Supp. 1228 (E.D. Mich. 1995).

5. See, e.g., Simply Fresh Fruit, Inc. v. Continental Ins. Co., 94 F.3d 1219 (9th Cir. 1996); Sentex Sys. Inc. v. Hartford Accident & Indem. Co., 882 F. Supp. 930 (C.D. Cal. 1995), aff'd, 93 F.3d 578 (9th Cir. 1996).

6. See, e.g., Granite State Ins. Co. v. Aamco Transmissions, Inc., 57 F.3d 316 (3d Cir. 1995).

Advance Watch Co., Ltd. v. Kemper National Insurance Co., 99 F.3d 795 (6th Cir. 1996), on which defendants rely. Advance Watch held that, where an insurance policy identifies specific language-based torts, unmentioned product-based violations cannot be thought reasonably to be within the same category. See id. at 804. Advance Watch held, specifically, that trademark infringement was not covered by the standard policy because there was no specific reference to trademark infringement. Because trademark litigation is a common and distinct category of lawsuit, the court found that if the insurer had intended to provide coverage it would have referred to trademarks by name, as it did with copyright. See id. at 803. The insurers urge us to adopt this reasoning with respect to the trade secret misappropriation and Lanham Act claims in this case.

Advance Watch has been sharply criticized for ignoring the real contours of intellectual property litigation, which often proceeds under a bewildering variety of different labels covering the same material facts. See, e.g., Industrial Molding Corp. v. American Manufacturers Mut. Ins. Co., 17 F. Supp. 2d 633, 639 (N.D. Tex. 1998). It may also stand in some tension with our decision in Granite State Insurance Co. v. Aamco Transmissions, Inc., 57 F.3d 316 (3d Cir. 1995), which declares that insurance policies governed by Pennsylvania law will be interpreted according to a reasonable insured's understanding rather than the narrow legal meaning of policy terms. Without passing on the merits of Advance Watch under Pennsylvania law, we conclude that Frog's alleged conduct does not fall within a reasonable insured's understanding of "misappropriation of advertising ideas or style of doing business."

Frog relies on Sentex Systems, Inc. v. Hartford Accident & Indemnity Co., 882 F. Supp. 930 (C.D. Cal. 1995), aff'd, 93 F.3d 578 (9th Cir. 1996), in which there were similar allegations of misappropriation of trade secrets and other confidential information and use of those secrets to promote the insured's security systems in competition with the underlying plaintiff. The Sentex court held that the phrase "misappropriation of advertising ideas or style of doing business," broadly construed, encompassed the

common law tort of unfair competition, which the underlying plaintiff had alleged.

The defendants properly point out that the Court of Appeals for the Ninth Circuit affirmed only after expressing its unease with the breadth of the district court's holding and emphasized that the insured was alleged to have misappropriated a customer list, methods of bidding jobs, billing methods and procedures, and marketing techniques, all of which it exploited to gain new business. The appellate court found that "[i]t is significant that[the] claims for misappropriation of trade secrets relate to marketing and sales and not to secrets relating to the manufacture and production of security systems." Sentex Sys., Inc. v. Hartford Acc. & Indem. Co., 93 F.3d 578, 580 (9th Cir. 1996). We would agree. Here, by contrast, the complaint does not allege that Frog misappropriated methods of gaining customers; it alleges that Frog misappropriated information about the manufacture of dipper buckets and then advertised the resulting product.

The insurers' basic point is that, to be covered by the policy, allegations of unfair competition or misappropriation have to involve an advertising idea, not just a non-advertising idea that is made the subject of advertising. See Atlantic Mut. Ins. Co. v. Badger Med. Supply Co., 528 N.W.2d 486, 490 (Wis. Ct. App. 1995) (an advertising idea is an "idea for calling public attention to a product or business, especially by proclaiming desirable qualities so as to increase sales or patronage"). As one court put it, "the broadest reading of misappropriating advertising ideas is that the insured wrongfully take an idea about the solicitation of business." Winklevoss Consultants, Inc. v. Federal Ins. Co., 991 F. Supp. 1024 (N.D. Ill. 1998).

Thus, while some causes of action for unfair competition, theft of trade secrets, or misappropriation may be covered by the standard policy, many are not. See, e.g., Winklevoss, 991 F. Supp. at 1026, 1039 (insured allegedly misappropriated software program and promoted resulting product to underlying plaintiff 's customers; claim for coverage rejected because the trade secret taken did not relate to how a product was advertised); GAF Sales & Serv., Inc. v. Hastings Mut. Ins. Co., 588 N.W.2d 165 (Mich. Ct.

9

App. 1997) (rejecting claim for coverage for defense against trade secret litigation where the misappropriated materials did not relate to advertising). The allegation that Frog engaged in unfair competition by misappropriating trade secrets relating to manufacture of a product line does not allege misappropriation of advertising ideas or styles of doing business as such.

Frog rejoins that, even if the initial unfair competition allegations were insufficient to trigger a duty to defend, the Second Amended Complaint's Lanham Act allegations did so. Decisionone Corp. v. ITT Hartford Insurance Group, 942 F. Supp. 1038 (E.D. Pa. 1996), found a duty to defend when the underlying plaintiff alleged that the insured falsely designated the source of its ability to maintain the plaintiff's equipment and falsely advertised that it could maintain the plaintiff's equipment, all in violation of the Lanham Act.

As the insurers note, however, in Decisionone the underlying complaint alleged that the insured made derogatory statements about the underlying plaintiff's own products, thus stating a cause of action for "disparagement," which was covered as advertising injury by a separate part of the standard policy. By contrast, nothing in Amsco's complaints alleged that Frog said anything disparaging about Amsco's products. See also Microtec Research, Inc. v. Nationwide Mut. Ins. Co., 40 F.3d 968, 971 (9th Cir. 1994) (rejecting coverage for a reverse passing off claim because "[t]he complaint alleged that Microtec passed off code created by Green Hills as though Microtec had written it, not that Microtec made disparaging statements about Green Hills . . ."); cf. Electrographics Int'l Corp. v. Federal Ins. Co., No. 98–3220, 1998 U.S. Dist. LEXIS 14685 (E.D. Pa. Sept. 21, 1998) (finding potential coverage where the underlying complaint alleged that the Lanham Act violations involved misrepresentations "related to the nature of both parties' products").

Frog emphasizes the Second Amended Complaint's reverse passing off claim. In Union Insurance Co. v. Knife Co., 897 F. Supp. 1213 (W.D. Ark. 1995), the underlying plaintiff alleged that the insured passed off its own products as the plaintiff 's, infringing on the plaintiff's

10

trademark. The court held that passing off constitutes "misappropriation of advertising ideas or style of business." See also Poof Toy Prods., Inc. v. U.S.F.&G., 891 F. Supp. 1228 (E.D. Mich. 1995) (same). Similarly, Dogloo, Inc. v. Northern Ins. Co., 907 F. Supp. 1383 (C.D. Cal. 1995), held that allegations that the insured misappropriated trade secrets in a doghouse design fit "squarely" within the policy language. The "advertising idea or style of doing business" misappropriated was manufacturing, advertising, and selling a dome-shaped doghouse. See id. at 1390; see also Elcom Tech., Inc. v. Hartford Ins. Co., 991 F. Supp. 1294 (D. Utah 1997) (where there were only two companies in afield, and one company advertised that it had the only patented technology for the product, allegations that the other falsely advertised that it had the only patented technology sufficiently alleged misappropriation of a style of doing business to trigger the insurer's duty to defend); P.J. Noyes Co. v. American Motorists Ins. Co., 855 F. Supp. 492, 494–95 (D.N.H. 1994) (allegation that the insured used the name "Dustfree Precision Pellets" arguably falls within misappropriation of advertising ideas or style of doing business where the underlying plaintiff alleged that it used similar words to mark its products).

We will assume for the sake of argument that trademark infringement is "misappropriation of an advertising idea or style of doing business" under Pennsylvania law. 7 Even so, trademark infringement differs from the allegations in ESCO's complaint. A trademark can be seen as an "advertising idea": It is a way of marking goods so that they will be identified with a particular source. See Northam Warren Corp. v. Universal Cosmetic Co., 18 F.2d 774, 774 (7th Cir. 1927) ("A trademark is but a species of advertising, its purpose being to fix the identity of the article and the name of the producer in the minds of people who see the advertisement . . . ."). A trademark depends for its effectiveness on communicating a message to consumers about the marked good, which is the essence of advertising,

_____

7. Recent dicta from the Pennsylvania Superior Court suggests this to be the case. See Sorbee Int'l Ltd. v. Chubb Custom Ins. Co., No. 2314 Philadelphia 1998, 1999 WL 512077, at *4 & n.2 (Pa. Super. July 21, 1999).

and therefore allegations of trademark infringement arguably allege misappropriation of an advertising idea. See, e.g., Industrial Molding Corp., 17 F. Supp. 2d at 637-38 (citing cases to show that this is the majority position).

Knife, Dogloo, and the other "passing off " cases all involved allegations that an insured was trading on the recognizable name, mark, or product configuration (trade dress) of the underlying plaintiff. In this case, however, the underlying complaint does not allege that what the insured took was itself an idea about identifying oneself to customers. The complaint did not allege that the misappropriated dipper bucket design served as an indication of origin, or that ESCO/Amsco's identifying marks were misused. Nor did ESCO allege that Frog took an idea about advertising dipper buckets (the idea of claiming a revolutionary new design as an enticement to customers); it alleged that Frog took the dipper bucket design itself and lied about the design's origin. See Applied Bolting Technology Prods., Inc. v. United States Fidelity & Guarantee Co., 942 F. Supp. 1029, 1034 (E.D. Pa. 1996) (making the distinction between taking an advertising idea and advertising falsely), aff'd without opinion, 118 F.3d 1574 (3d Cir. 1997); see also Sorbee Int'l Ltd. v. Chubb Custom Ins. Co., No. 2314 Philadelphia 1998, 1999 WL 512077, at *5 (Pa. Super. July 21, 1999) (making the distinction between "misuse in advertising of any idea" and "misappropriation of advertising ideas") (internal quotations omitted).

Similarly, ESCO alleged not that Frog copied a style of doing business--a plan for interacting with consumers and getting their business--but that Frog copied a particular product line that might be attractive to consumers. See Winklevoss, 991 F. Supp. at 1039 (style of doing business involves the "outward appearance or signature of a business," while a claim for theft of trade secrets involved "the theft of [the underlying plaintiff 's] products' inner workings, not their outward appearance"); Applied Bolting Technology, 942 F. Supp. at 1033-34 (a single product from a product line is not a style of doing business).

We predict that, regardless of how Pennsylvania law would treat allegations of trademark infringement,

12

Pennsylvania courts would not find that the allegations in this case fall within a reasonable understanding of the policy terms. Thus, the District Court was correct that the underlying complaint did not allege an advertising injury. Because of our resolution of this issue, we need not address the insurers' argument that there was no causal connection between Frog's advertising activity and ESCO's alleged injuries.8 We also need not address Travelers's

_____

8. We note, however, that there is much confusion in the caselaw concerning when an "advertising injury" is"caused" by advertising within the meaning of standard business insurance policies. As a reading of the briefs in this case reflects, many courts have conflated the requirement of "advertising injury" as defined in the standard policy with the requirement that the injury occur in the course of advertising, with the unfortunate result that they have distorted standard causation principles. See, e.g., Novell, Inc. v. Federal Ins. Co., 141 F.3d 983 (10th Cir. 1998). Thus, the courts reach the correct result that an injury was not "advertising injury" and then reason, incorrectly (and unnecessarily), that the advertising did not cause the injury.

For example, suppose the underlying complaint alleges patent infringement, and alleges that the plaintiff lost sales because the insured aggressively advertised the infringing product. Standard tort principles (not to mention common sense) tell us that the advertising was a cause in fact of at least a portion of the plaintiff 's damages. Courts that reason that the injury could have taken place without the advertising, see Simply Fresh Fruit, Inc. v. Continental Ins. Co., 94 F.3d 1219, 1222 (9th Cir. 1996), are misstating the relevant tort liability principles, which ask whether the advertising did in fact contribute materially to the injury. Similarly, courts that hold that, as a matter of law, advertising a misappropriated product is merely "coincidental," are not confronting the causal connection between advertising and harm. See Fluoroware, Inc. v. Chubb Group of Ins. Cos., 545 N.W.2d 678, 682 (Minn. 1996).

Some courts have solved the problem by requiring that the injury be complete in the advertisement, requiring no further conduct. See, e.g., Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 339 n.3 (9th Cir. 1996) (discussing the California approach); Dogloo, 907 F. Supp. at 1390 ("The cases . . . illustrate that advertising injury coverage does not extend to cases in which advertising alone is not actionable."). We believe that this formulation is a reasonable way to limit the scope of causation. Thus, if an advertisement invaded a person's privacy (causing an advertising injury), and the insured's product also invaded a person's privacy (causing an advertising injury), the advertisement would cause part of

argument that various policy exclusions preclude Frog's suit. Finally, we reject in the margin Frog's claim for bad faith denial of coverage.9

_____

the total harm and would constitute a complete tort in itself. In such a case, we think that there would be a duty to defend. See id. The duty to indemnify, however, would be limited to the harm caused by the advertisement.

At all events, the belt-and-suspenders approach to denying coverage is, in this case, unnecessary. Causation alone does not equate to insurance coverage. Perhaps courts have failed to engage in rigorous causation analysis in many cases because they have already found that there is no advertising injury. Indeed, we have found no actual case in which a court has found "advertising injury" but not causation. Cf. International Communication Materials, Inc. v. Employer's Ins., No. 94-1789, 1996 U.S. Dist. LEXIS 21825 (W.D. Pa. May 29, 1996) (finding that, where the policy listed patent infringement under the definition of "advertising injury," there was a genuine issue of material fact regarding whether the infringement caused harm in the course of advertising). While Amsco's underlying complaint specifically alleges that Frog's advertising contributed to its injuries, thus sufficiently alleging a causal connection between the advertising and the injury, that is not enough to trigger the insurers' duty to defend.

9. A refusal, with no good cause, to provide a defense or to indemnify when the policy provides for coverage violates Pennsylvania's bad faith insurance statute. See 42 Pa. Stat. Ann.S 8371 (creating a remedy "if the court finds that the insurer has acted in bad faith towards the insured"). Bad faith is a frivolous or unfounded refusal to pay, lack of investigation into the facts, or a failure to communicate with the insured.
See Coyne v. Allstate Ins. Co., 771 F. Supp. 673, 678 (E.D. Pa. 1991) (bad faith is failure to acknowledge or act promptly on the claims, or refusing to pay without reasonable investigation of all available information); Romano v. Nationwide Mut. Fire Ins. Co., 646 A.2d 1228 (Pa. Super. Ct. 1994). Good faith is no defense if there was in fact no good cause to refuse coverage. See Gedean v. State Farm Mut. Auto. Ins. Co., 188 A.2d 320, 322 n.4 (Pa. 1963). However, mere negligence or bad judgment does not constitute bad faith; knowledge or reckless disregard of a lack of a basis for denial of coverage is necessary. Winner International Corp. v. Continental Casualty Co., 889 F. Supp. 809 (W.D. Pa. 1994), aff 'd without opinion, 54 F.3d 767 (3d Cir. 1995).

The District Court reasoned that bad faith claims cannot survive a determination that there was no duty to defend, because the court's determination that there was no potential coverage means that the

14

The Orders of the District Court will be affirmed.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit
_____

insurer had good cause to refuse to defend. See Lucker Mfg. v. Home Ins. Co., 23 F.3d 808, 821 n.19 (3d Cir. 1994); Hyde Ath. Indus., Inc. v. Continental Cas. Co., 969 F. Supp. 289, 306 (E.D. Pa. 1997).

Frog argues that a bad faith claim is not contingent on success on the underlying breach of contract claim, citing Doylestown Electric Supply Co. v. Maryland Casualty Insurance Co., 942 F. Supp. 1018, 1020 (E.D. Pa. 1996). But that case involved a situation in which the statute of limitations had expired on the breach of contract claim; a breach of a duty to defend was unredressable for procedural reasons, but it was still possible that a bad faith claim could succeed. Here, where there was no duty to defend, there was good cause to refuse to defend against a suit.

15